UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| GINA PURVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-1350 |
| ) | |
| MICHAEL RIBAS, Marylynn RIBAS, and ) | |
| MICKEY RIBAS, ) | |
| ) | |
| Defendants. ) | |

## ORDER

Before the Court is a Motion for Summary Judgment by Defendants Michael and Marylynn Ribas. For the reasons set forth below, the Defendants' Motion for Summary Judgment [#62] is GRANTED.

## JURISDICTION

This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship, and the matter in controversy exceeds $75,000.00.

## BACKGROUND

As the Court has previously stated on more than one occasion, this litigation arises out of an unfortunate series of events. The Plaintiff, Gina Purvis ("Purvis"), was a tenured Biology teacher at Hall High School ("Hall") in Spring Valley, Illinois. The tale begins back in the Spring of 2004 when Purvis and Mickey Ribas ("Mickey"), who was then her 15-year-old student, became the subject of rumors that there was a sexual relationship between them. When questioned by Hall Principal Patricia Lunn ("Lunn"), both Purvis and Mickey denied the rumors.

As the rumors continued into the Fall, Lunn and Daniel Oest ("Oest"), Hall's Superintendent, determined that Oest and Gary Vicini ("Vicini"), Hall's Dean of Students and head football and track coach, should investigate. This would sound like a good plan, except for the fact that Oest was not informed that Purvis had previously reported Vicini to Lunn for his alleged sexual harassment of a female student the year before. From this, it would not be difficult to infer that Vicini may not have been the most objective investigator for this particular assignment.

On November 10, 2004, Oest and Vicini met with Mickey. Mickey denied any sexual relationship with Purvis. During the criminal trial, Mickey testified that in response to his denials on November 10, 2004, Vicini told him that he would be in trouble if he didn't say the story was true and threatened him with expulsion or jail if he persisted in denying the existence of a sexual relationship with Purvis. Mickey changed his story and told them that he had sex with Purvis on several occasions. Oest then called Chief Douglas Bernabei ("Bernabei") of the Spring Valley Police Department to report the allegations of sexual abuse against Purvis. Bernabei met with Mickey that afternoon and notified DCFS of the allegations of sexual abuse.

Beginning on November 10, 2004, Purvis was investigated for sexual assault against Mickey. She was indicted by a grand jury and arrested on December 15, 2004. After initially being suspended by the School Board with pay pending the outcome of the criminal proceedings, Purvis was subsequently terminated. On December 20, 2005, Purvis and the school district reached a settlement whereby she agreed to voluntarily resign her employment in exchange for the sum of $43,000. On October 31, 2005, at the conclusion of a six-day bench trial, Purvis was acquitted of all charges.

Purvis brings this suit against Mickey, as well as his parents, Michael and Marylynn Ribas (the "Ribases"), alleging: (1) a claim of intentional infliction of emotional distress against Mickey and his parents; (2) a claim of defamation *per se* against Mickey; and (3) a claim of invasion of privacy against Mickey. The Ribases have now moved for summary judgment on the intentional infliction of emotional distress claim asserted against them; the Motion is not brought on behalf of Mickey. The matter is now fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record

and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

In order to state a claim for IIED, the plaintiff must show: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. Graham v. Commonwealth Edison Co. 318 Ill.App.3d 736, 745, 742 N.E.2d 858, 866 (1st Dist. 2000); Lewis v. School District #70, 523 F.3d 730, 746 (7th Cir. 2008). To be actionable, "the distress suffered must be such that no reasonable person could be expected to endure it." Harris v. First Fed. Sav. & Loan Ass'n of Chicago, 129 Ill.App.3d 978, 981, 473 N.E.2d 457 (1st Dist. 1984). The tort does not extend relief for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Lewis, 523 F.3d at 746-47, *citing* McGrath v. Fahey, 126 Ill.2d 78 (1988).

The Ribases first argue that their conduct does not rise to the level of extreme and outrageous conduct. It is well-settled that the threshold for stating an IIED claim is "quite high." Id., at 747. Conduct must be evaluated objectively based on all the facts and circumstances. Graham, 318 Ill.App.3d at 745. A defendant will only be held liable for conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Public Finance Corp. v Davis, 66 Ill.2d 85, 90, 360 N.E.2d 765, 767 (1976) (quoting Restatement (Second) of Torts §46, Comment *d* (1965)); Tuite v. Corbitt, 358 Ill.App.3d 889 (1st

Dist. 2005). Indeed, the conduct must fairly be regarded as intolerable in a civilized society. Adams v. Sussman & Hertzberg, Ltd., 292 Ill.App.3d 30, 38 (1st Dist. 1997). Thus, "to serve as a basis for recovery, the defendant's conduct must be such that the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim: Outrageous!'" Lewis, 523 F.3d at 747, *citing* Honaker v. Smith, 256 F.3d 477, 490 (7th Cir. 2001); Doe v. Calumet City, 161 Ill.2d 374 (Ill. 1994).

     Here, Purvis bases her IIED claim against the Ribases on failing to affirmatively volunteer the following information to the authorities during the investigation: (1) that Mickey often made up stories, lied, and exaggerated; (2) that Mickey had been arrested for underage drinking and was receiving counseling for alcohol abuse; (3) that Mickey was a paid informant for the LaSalle County Drug Enforcement Task Force; (4) that Purvis counseled and mentored Mickey; and (5) that Mickey downloaded graphic internet sex sites on the family computer. She further finds fault with the fact that the Ribases failed to disclose that they knew of and approved of her relationship with Mickey, including that Purvis visited Mickey at their home, drove him to and from school, called the house and spoke to them before speaking to Mickey, and gave him a jean jacket. Mickey was allowed to visit Purvis' home, and Michael Ribas even drove him there on one occasion. They knew that Mickey dated Gina Marie Golden. Michael Ribas' testified that he drove Mickey to Purvis' house twice (while Purvis testified it was once) and provided a date for one of the trips that was virtually impossible due to Mickey's injury following a car accident. Marylynn Ribas also assisted the police department in attempting to obtain a confession from Purvis during a telephone call and refused to cooperate with Purvis' investigators.

Purvis claims that despite their awareness that Mickey claimed that their family computer contained emails corroborating his relationship with Purvis, the Ribases destroyed evidence by allowing their computer operating system to be reinstalled. This essentially had the effect of erasing the prior contents of the computer. Marylynn Ribas claimed that this was necessary because the computer had viruses and had to be fixed. The State Police forensic examination detected no viruses on the system, but confirmed that there were numerous deletions after the computer had been subpoenaed by Purvis in her criminal prosecution. Marylynn Ribas testified that only she or Mickey would have deleted anything from the computer.

Purvis further complains that while she and her husband were shopping at Farm & Fleet after Mickey made his allegation of abuse, Mickey saw them and made a threatening or harassing call to them on their cell phone. Michael Ribas falsely told the police that Mickey was with him the entire time during the visit to Farm & Fleet, but Mickey admitted to the police officer that he had in fact called Purvis while he wasn't with his father. Purvis complains that the Ribases also did nothing while Mickey and his friends made an obscene videotape in the basement of their house and sent the tape to her niece.

Initially, the Court notes that discovery in this litigation and the companion case has established that the authorities were well aware of the fact that Mickey had been arrested for underage drinking and was a paid informant for the drug task force. Moreover, there is no evidence in the record indicating that the Ribases were even aware of the obscene videotape being made in their basement or the fact that it had been sent to Purvis' niece before hearing about it at the criminal trial and through the discovery process in this case. *See* Michael Ribas Dep. at 33. Purvis further fails to recognize that any testimony given by the Ribases as witnesses

during the criminal trial, even if conflicting or untruthful, cannot form the basis for civil liability under Briscoe v. LaHue, 460 U.S. 325, 330-32 (1983).  Purvis has also failed to establish that Marylynn Ribas had any duty or legal obligation to either refuse Chief Bernabei's request that she participate in an overhear call to Purvis or to cooperate with Purvis' investigators.  The Ribases were not involved in their son's decision to assert claims against Purvis and only became aware of his allegations after they had already been reported to the School District and the police.

That being said, even considering all of the alleged misconduct together and construing the evidence – not the conjecture – in the light most favorable to Purvis, the high standard for extreme and outrageous conduct has simply not been met.  Purvis may have demonstrated that the Ribases are not going to receive any awards for superior parenting and that they may have failed to satisfy some moral duty to volunteer information to the authorities or help her build her defense.  However, she has shown no breach of a legal duty, and while some of their conduct could aptly be described as negligent, mistaken, or even morally lacking, it would not prompt a reasonable person to exclaim, "Outrageous!"

Much of what Purvis has identified involves passive conduct (i.e., not volunteering information, not cooperating with her investigators, not supervising their son).  In Adams v. Sussman & Hertzberg, 292 Ill.App.3d 30, 39 (1st Dist. 1997), the plaintiff was arrested and charged with a crime that he did not commit.  The complainant further refused to withdraw his complaint after learning exculpatory information and did not convey the exculpatory information to the police.  Id., at 40.  The Illinois Appellate Court found that the failure to notify the authorities of the exculpatory knowledge or withdraw the criminal complaint "would not have

risen to the level of extreme outrageousness." Id. The court noted that once the criminal complaint was lodged, "the furtherance and prosecution of the criminal action was in the control of the state's attorney" and neither the complainant nor his employer could do anything to stop it. Id. As "a private complainant lacks the power to preempt the discretion of the prosecutor to proceed on the complaint, any omission in failing to inform the prosecutor of newly discovered information relevant to the criminal action set in motion would arguably, at best, constitute passive conduct that by its very nature could not rise to the level of outrageous conduct." Id. The Court sees no reason why the logic of this decision is not equally compelling in this case, particularly as none of the alleged omissions would have in and of themselves exonerated Purvis of the alleged criminal misconduct.

Purvis persists in describing Marylynn Ribas' participation in the telephone overhear at the request of Chief Bernabei as attempting to "entrap" her. However, entrapment by definition refers to a situation where law enforcement attempts to induce a defendant to engage in criminal conduct solely for the purpose of obtaining evidence of a crime. Blacks Law Dictionary (8th Ed. 2004); United States v. Evans, 924 F.2d 714, 716-17 (7th Cir. 1991). Here, the goal of the phone call was to obtain a confession, not to induce Purvis to have sex with Mickey or to coerce her into committing some crime. Even assuming that such a characterization is warranted, Illinois courts have held that actual entrapment (i.e., causing a defendant to take action that constitutes criminal activity) does not rise to the level of extremity and outrageousness necessary to support and IIED claim. Khan v. American Airlines, 266 Ill.App.3d 726, 733 (1st Dist. 1999), *abrogated on other grounds by* Velez v. Avis Rent A Car Systems, 308 Ill.App.3d 923 (1st Dist. 1999) (holding that "[w]e do not believe that the alleged acts of the defendant could be considered

conduct that goes beyond all possible bounds of decency . . . .") Purvis' argument to the contrary and attempt to distinguish the clear holding in Khan that entrapment by giving a defendant a stolen plane ticket and then arresting him for possessing it is not conduct that goes beyond all possible bounds of decency is without merit.

The most serious of the conduct by the Ribases concerns allegations that the Ribases destroyed evidence on their home computer. Here, Purvis plays fast and loose with the actual facts of record. She asserts that the computer was subpoenaed by her defense team, forensically examined, and found to have had thousands of deletions from the time Mickey first made allegations against her on November 10, 2004, including some deletions after the subpoena was served. According to the forensic examiner, the operating system on the Ribas computer was reinstalled on December 21, 2004, and there is no evidence that the computer was subpoenaed prior to that date. It is therefore difficult to justify why the Court should assign malicious motives to the Ribases for something that was done to their computer at a time when no one had told them that their computer was wanted as evidence and should not be altered.

She states, "Michael allowed the destruction of evidence on his home computer," yet none of the "facts" that she cites in support of her argument support this conclusion. Purvis points to testimony from Marylynn Ribas that the computer was broken and had to be fixed because there were viruses, but argues that the state police found no viruses. The trial testimony of the forensic examiner was actually that she ran an anti-virus check on the computer to determine if there were any existing viruses and found none; this is much different than saying that there had never been any viruses on the computer as Purvis would seem to suggest. In fact,

the forensic examiner testified that there was no way to determine whether there had been viruses on that computer prior to the reinstallation of the operating system in December 2004.

The forensic examiner testified that she found 698 deleted files on the Ribas computer. Marilyn Ribas stated that she and Mickey were the only ones who would have performed any deletions, and that Michael testified that he never deleted anything. This does not even reveal an awareness by Michael Ribas that the computer's operating system had been replaced, much less promote the reasonable inference that he "allowed the destruction of evidence on his home computer." Purvis even lists as an additional undisputed fact that Michael Ribas has no idea why the State Police found over 16,000 deletions from his family computer.[1]

Purvis also cites as an undisputed fact Michael Ribas' testimony that he first found out that Mickey had contacted Purvis' mother through the internet at the criminal trial, which was after the computer's operating system had been replaced and the computer taken for forensic examination. She asserts that Marylynn testified that she had deleted things from the computer, but her actual testimony was that she only deleted emails after reading them because she did know how to do anything else with the computer except look up the Avon website. (Marylynn Ribas Dep. at 91) She further testified that after receiving the subpoena, neither she nor Michael deleted any files. Id., at 116-17. As soon as they received the subpoena, they unplugged the computer. Id., at 118.

Finally, the forensic examiner testified that among the deleted files that she recovered were a couple of pornographic web sites and a few emails between Mickey and Purvis

---

[1] The Court would also note that only a small percentage of these deletions were actually found on the Purvis' computer. The remainder were on a second computer owned by Marylynn Ribas' mother.

containing "personal information" such as "I love you, I miss you." This information would certainly raise issues of Purvis' credibility, as she has always denied having ever communicated with Mickey via email.

In an attempt to salvage her claim, Purvis cites Graham, 318 Ill.App.3d at 745, in making the rather oblique argument that the relationship between the parties in this case makes the Ribases' conduct more likely to be deemed outrageous because of the degree of power and control that they had over her. With all due respect, the degree of power and control argument is completely misplaced in this case. This theory is based on the existence of a special legal or financial relationship and has been applied in cases involving police, school officials, landlords, creditors, insurance companies, and employers. McGrath v. Fahey, 126 Ill.2d 78, 87-88 (Ill. 1989). Nothing even remotely similar to that is applicable here, where the Ribases were the parents of a minor who had accused Purvis of sexually abusing him and had no legal or financial authority over her; there can be no credible suggestion that they somehow used their position as Mickey's parents to force her to do something. Rather, Purvis attempts to morph this fact into some duty to take affirmative action to inject themselves into the investigation, answer questions that weren't asked, or volunteer information that they arguably weren't even aware of at the time. The Court finds no good faith basis for the application of the special relationship standard in this case.

What happened here is unfortunate, and in a perfect world, things might have happened differently. That being said, Purvis has not demonstrated misconduct by Michael or Marylynn Ribas that goes beyond all bounds of decency or that would be considered intolerable in civilized society. Accordingly, the Court concludes that Purvis has failed to meet her burden of bringing

11

forth evidence of extreme and outrageous conduct by the Ribases. As such, her claim against them must fail as a matter of law, and they are entitled to summary judgment on Count I of the Second Amended Complaint.[2]

## CONCLUSION

For the above reasons, the Ribases' Motion for Summary Judgment [#62] is GRANTED. Michael and Marylynn Ribas are terminated as parties to this case. However, the three claims asserted against Defendant Mickey Ribas remain, and this matter remains set for final pretrial conference on February 18, 2009, with jury trial to follow on March 30, 2009.

ENTERED this 6th day of February, 2009.

                                      s/ Michael M. Mihm
                                      Michael M. Mihm
                                      United States District Judge

.

---

[2] Parenthetically, the Court also notes that even if the Ribases' conduct could somehow be deemed sufficiently severe and outrageous, there is a serious questions as to whether Purvis has established that the Ribases' alleged misconduct was the actual cause of her emotional distress.